Annette WRIGHT, Plaintiff,

v.

Howard SAFIR, New York City Police Commissioner, and Chairman of the Board of Trustees of the Police Pension Fund and the Police Pension Fund, the Article II Medical Board, and William Bratton, as former Police Commissioner, Defendants.

No. 96 CIV. 3369(JSR).

United States District Court, S.D. New York.

Nov. 10, 1997.

Rosemary Carroll, Carroll & Frioss, New York City, for Plaintiff.

Anshel David, Lisa Lempel–Sander, Paul A. Crotty, Corporation Counsel of the City of New York, New York City, for Defendants.

## MEMORANDUM ORDER

RAKOFF, District Judge.

Plaintiff Annette Wright claims that the eight administrative hearings she had in connection with her forced retirement from the police force were insufficient due process. The Court concludes, by contrast, that she has received her due.

Ms. Wright brings this action pursuant to 42 U.S.C. § 1983, alleging that the proceedings that resulted in her being involuntarily retired from the police force on the grounds of mental disability violated her constitutional rights. Following discovery, both sides moved for summary judgment. Upon review of the papers and the oral argument held on May 21, 1997, the Court hereby grants summary judgment in favor of the defendants, for the following reasons.

The essential facts are undisputed. On January 9, 1990, plaintiff, a tenured New York City police officer appointed on July 30, 1987, wounded her police officer boyfriend, Randolf Hoover, with a knife. Plaintiff was suspended from duty, and subsequently pleaded *nolo contendere* to a disciplinary charge of wrongfully causing injury to Hoover. On February 15, 1990, plaintiff was removed from suspension status, referred to the Psychological Services Unit ("PSU"), and placed on restricted duty. While on restricted duty, plaintiff was monitored by supervisory lieutenants and by representatives of the PSU, the latter including a Police Department consulting psychiatrist, Dr. Abraham Pinsky. Plaintiff was also examined by her own retained psychiatrist, Dr. James Cavenaugh.

In 1991, both Dr. Pinsky and Dr. Cavenaugh concluded, based on separate interviews with plaintiff, that plaintiff was fit to return to full duty. However, two Police Department psychologists and two other PSU doctors who examined plaintiff in 1992 reached the opposite conclusion, based in part on evidence from plaintiff's work supervisors that plaintiff continued to have serious confrontations with her co-workers. PSU therefore recommended that plaintiff be mentally "surveyed" by the three-doctor police Medical Board. The Police Commissioner adopted the recommendation, and ordered that plaintiff be surveyed by the Medical Board to determine whether she was mentally fit for active police duty.

On March 1, 1993 plaintiff was surveyed by the Medical Board. Pursuant to the procedures then in place, plaintiff's counsel was not permitted at the hearing itself, although counsel submitted a substantial written presentation to the Board. See Declaration of Lisa Lempel–Sanders, Ex. 13. Following the hearing, the Board issued a detailed written report recommending that plaintiff be retired on disability. *Id.* at Ex. 15. On May 12, 1993, pursuant to statutory procedure, the Board of Trustees of the Police Pension Fund, having received written objections from plaintiff's counsel, reviewed the Medical Board's recommendation, and remanded the case to the Medical Board for further consid-

eration in light of possible new evidence. *Id.* at Ex. 16.

On November 1, 1993, plaintiff was examined by the Medical Board for a second time, after which the Medical Board issued another report assessing the "new" evidence and reaffirming its previous recommendation. *Id.* at Ex. 17. Plaintiff's counsel appealed again to the Board of Trustees. On April 13, 1994, after again reviewing the recommendation of the Medical Board and the further objections of plaintiff's counsel, the Board of Trustees yet again remanded the case to the Medical Board, this time specifying particularized questions for the Medical Board to answer. *Id.* at Ex. 19.

On July 25, 1994, the plaintiff went before the Medical Board for a third time, after which the Medical Board issued a third report that both specifically answered the questions posed by the Board of Trustees and reaffirmed its previous recommendation. *Id.* at Ex. 20. After receiving the objections of plaintiff's counsel, the Board of Trustees once again reviewed the recommendation of the Medical Board and, on March 15, 1994, once again remanded the case, this time so that the Medical Board could reconsider the case pursuant to new proposed due process standards applicable to psychological disability cases that were about to be adopted but that had not been in place previously. *Id.* at Ex. 22. The new procedures required, *inter alia,* that an officer being surveyed by the Medical Board be given fair notice, an opportunity to object, an opportunity to review all files under consideration by the Medical Board, an opportunity to retain a medical professional to appear before the Medical Board on the officer's behalf and present evidence, and an opportunity on appeal for the officer or her attorney to present written arguments and new evidence to the Board of Trustees. *Id.* at Ex. 23.

On March 18, 1996, the Medical Board reviewed plaintiff's case for a fourth time, pursuant to these new procedures. In the interim, an updated psychological evaluation of plaintiff had been conducted on February 2, 1996 by Dr. Andrew Propper, the senior psychologist with the PSU, who concluded that plaintiff was not psychologically fit for duty. At the March 18 hearing, plaintiff, who had been made aware of the updated evaluation and the new procedures, neither availed herself of the opportunity to retain a medical professional to speak on her behalf before the Medical Board nor presented any new evidence on her psychological condition. Once again, the Medical Board issued a written report recommending plaintiff's retirement for mental disability. *Id.* at Ex. 25. This time, however, the Board of Trustees, by an evenly-divided vote, adopted the recommendation of the Medical Board and on April 17, 1996 approved the police commissioner's recommendation that plaintiff be retired on ordinary disability as mentally unfit. *Id.* at Ex. 26. Plaintiff's retirement was effective as of June 15, 1996. She timely commenced this action on May 8, 1996.

In now moving and cross-moving for summary judgment, the parties are in agreement that plaintiff, as a tenured police officer, had a property interest in her job of which she could not be deprived without due process, *see Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985), as well as a constitutional liberty interest similarly implicated by her involuntary termination for mental incapacity. *See Lombard v. Bd. of Educ. of City of New York,* 502 F.2d 631, 637–38 (2d Cir. 1974), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975). Thus the central disputed issue is whether the defendants' procedures for involuntary retirement for psychological disability afforded plaintiff adequate due process under the Fourteenth Amendment.

Due process is a flexible notion that "calls for such procedural protections as the particular situation demands." *Basciano v. Herkimer,* 605 F.2d 605, 609 (2d Cir.1978), *cert. denied,* 442 U.S. 929, 99 S.Ct. 2858, 61 L.Ed.2d 296 (1979) (citation omitted). In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court set forth three factors to consider in determining whether administrative procedures are constitutionally sufficient:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such

interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903.

Several courts in this district have applied these broad principles to assess the constitutional adequacy of the procedures for involuntary retirement from the New York City Police Department, though none of these cases dealt with the Board of Trustees' new procedures applicable to psychological disability cases. *See Coffran v. Bd. of Trustees of the New York City Pension Fund,* 842 F.Supp. 723, 729 (S.D.N.Y.1994), *vacated on other grounds,* 46 F.3d 3 (2d Cir.1995); *Lenihan v. City of New York,* 636 F.Supp. 998 (S.D.N.Y.1985); *Laurido v. Simon,* 489 F.Supp. 1169, 1177–78 (S.D.N.Y.1980); *Snead v. Dep't of Social Servs. of. City of New York,* 355 F.Supp. 764, 773 (S.D.N.Y. 1973), *vacated on other grounds,* 416 U.S. 977, 94 S.Ct. 2376, 40 L.Ed.2d 755 (1974). Plaintiff also refers the Court to Sections 72, 73 and 75 of the New York Civil Service Law, which apply in certain analogous circumstances and which arguably entail procedures going somewhat beyond what the Board of Trustees here required. But these sections are not determinative of what the constitution requires. *See Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). In *Washington,* the Court specifically rejected the necessity of a judicial hearing where a psychiatric medical determination was at issue, explaining:

> Although we acknowledge the fallibility of medical and psychiatric diagnosis ... we do not accept the notion that the shortcomings of specialists can always be avoided by shifting the decision from a trained specialist using the traditional tools of medical science to an untrained judge or administrative hearing officer after a judicial-type hearing. Even after a hearing, the nonspecialist decisionmaker must make a medical-psychiatric decision. Common human experience and scholarly opinions

suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of mental and emotional illness may well be more illusory than real.

*Id.* at 232, 110 S.Ct. at 1042 (citing *Parham v. J.R.,* 442 U.S. 584, 607–09, 99 S.Ct. 2493, 2506–08, 61 L.Ed.2d 101 (1979)).

Applying the foregoing principles to the case at bar, the Court finds that the new procedural protections promulgated by the Board of Trustees in 1994 and afforded to plaintiff in connection with her last appearance before the Medical Board were constitutionally adequate. The new procedures entailed, *inter alia,* a new psychological examination of plaintiff, access by plaintiff to all of the evidence to be considered by the Medical Board, and opportunity for plaintiff or her attorney to present written evidence to the Medical Board prior to its determination. The new procedures also permitted plaintiff to retain a health professional to speak on her behalf at the examination, and further permitted plaintiff or her attorney to present written arguments and new evidence to the Board of Trustees in support of a request for remand to the Medical Board. These and other provisions of the new procedures afford plaintiff every reasonable procedural protection required under *Washington,* including many protections that, as noted, she voluntarily chose not to utilize.

While plaintiff asserts that the procedures improperly placed the burden of proof on the plaintiff, rather than on the police commissioner, in actuality the new procedures placed on the police commissioner the requirement of "the establishment of mental incapacity for the performance of full police duty by a preponderance of the evidence." *See* Declaration of Lisa Lempel–Sanders at Ex. 23.

Plaintiff makes a better point when she notes that the new procedures nowhere require the Medical Board to set forth a detailed record of its findings and conclusions so as to apprise the parties of its reasoning and provide an adequate basis for review by the Board of Trustees or other entity. Indeed, the Medical Board's final report of

March 18, 1996 is largely conclusory except in its reference to the updated report from Dr. Propper. *See id.* at Ex. 25. But the final report does not exist in a vacuum. Rather, it explicitly incorporates by reference the Medical Board's own prior reports and minutes which, as noted, are reasonably detailed and precise. In that context, it is clear that the Medical Board reached its final conclusion because, *inter alia,* every psychologist and psychiatrist who had examined plaintiff after 1991—including the senior psychologist who examined her, under the new procedures, in 1996—had found that she was psychologically unfit for active police service. Moreover, the entire record—including the transcripts of the proceedings before the Board of Trustees, *see id.* Exs. 16, 19, 22 and 26—bears ample testimony to the close scrutiny that the Board of Trustees repeatedly gave to every aspect of this case, including the Medical Board's final report. The final decision of the Board of Trustees to affirm the Medical Board's recommendation, after having sent it back three times previous for further determinations and reviews, can hardly have been taken in ignorance of the basic issues in the case, including the positions so vigorously espoused by plaintiff and her counsel throughout the proceedings.

The Court has considered plaintiff's other claims and contentions, including its state law claim, and finds them without merit. Accordingly, the Court grants defendant's motion for summary judgment in its entirety, denies plaintiff's cross-motion for same, and dismisses the Complaint. Clerk to enter judgment.

SO ORDERED.